932 P.2d 896

**CAPITAL CARE CENTER,**
Petitioner–Appellant,

v.

**IDAHO DEPARTMENT OF HEALTH
AND WELFARE, Respondent.**

No. 22683.

Supreme Court of Idaho.
Boise, December 1996 Term.

Feb. 25, 1997.

Lojek & Strother Chartered, Boise, for petitioner-appellant. Donald W. Lojek argued.

Alan G. Lance, Attorney General; Willard R. Abbott (argued), Deputy Attorney General, Boise, for respondent.

JOHNSON, Justice.

This is a Medicaid reimbursement case. We conclude that the department of health and welfare correctly denied reimbursement to a provider, and that the regulations under which the department denied reimbursement are not unconstitutionally vague.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

Capital Care Center (CCC) is a health care facility which provides care to medicaid patients. In 1988, Southmark Corporation (Southmark), which owned CCC, created Shoreham Capital Healthcare Associates (Shoreham) and sold CCC to Shoreham. Also in 1988, Southmark created American Services Company (ASC). On September 19, 1988, ASC and Shoreham, acting through Southmark as its managing general partner, signed a twenty-year contract (the contract)

for the provision of laundry and housekeeping services at CCC. At the time the contract was executed, both CCC, through Shoreham, and ASC were owned by Southmark. Following the execution of the contract, Southmark sold ASC to Health Services Group (HSG). On November 6, 1990, the contract was amended, but the amendment did not substantially change the nature or terms of the contract. ASC was a subsidiary of HSG until December 31, 1990, when ASC merged with HSG and ASC ceased to exist. Southmark remained the managing general partner of Shoreham until June 1990, when LPIMC, Inc. became the managing general partner by court order, which it remained up to the time of the administrative hearing that produced the decision now before us for review. Later, Shoreham Capital Management (not to be confused with Shoreham Capital Healthcare Associates, described above) became the managing general partner of CCC.

The Idaho department of health and welfare (the department) received CCC's initial cost report for the fiscal year 1991 on April 16, 1992. In this report, CCC acknowledged that it had engaged in a related-party transaction with HSG during the fiscal year 1991, but indicated that CCC fell under an exception which allows full Medicaid reimbursement in a related-party transaction.

A specialist for the department reviewed the report to make an initial determination concerning its acceptability. The specialist determined that CCC's cost report was not acceptable, in part because the costs reported by CCC for laundry and housekeeping services were reported at the rate provided in the contract (the contract rate). The specialist concluded that the contract rate, $4.08 per patient day, violated both the related-party and reasonable-cost rules. The specialist advised CCC that he would not accept a cost report which did not reduce the reported housekeeping services and laundry costs of $4.08 to $3.46 per patient day. CCC then submitted a second cost report which reported laundry and housekeeping costs of $3.46 per patient day.

CCC requested administrative review of the related-party issues. The department's hearing officer continued the hearing and remanded the case to the department for a determination of whether a related-party transaction existed between CCC and HSG. The department concluded that a related-party transaction had occurred. CCC then submitted a third cost report which did not contain a reference to a related-party transaction and reported housekeeping and laundry cost of $4.08 per patient day. Because the department had already accepted the second cost report, the department did not review the third cost report.

After the department's decision following remand by the hearing officer, the hearing officer held an administrative hearing and issued a preliminary order. In this order, the hearing officer concluded that there was a related-party transaction and that CCC did not qualify for an exemption to the related-party rules. The department adopted the preliminary order by a final decision and order. CCC sought review by the district court, which affirmed the department's decision. CCC appealed.

## II.

### THE DEPARTMENT CORRECTLY DENIED REIMBURSEMENT BASED ON THE CONTRACT RATE.

CCC asserts, on various grounds, that the department should have allowed reimbursement based on the contract rate. We disagree.

CCC argues that the department's denial of reimbursement based on the contract rate was arbitrary and capricious, was in excess of the department's authority, and prejudiced substantial rights of CCC.

At issue in this case is the relationship between the Idaho "provider reimbursement manual," 16 IDAPA 3.10 et seq. (the PRM) and the federal "health insurance manual 15" (the HIM 15). The applicable statute provides that cost reports are to be audited by the director of the department

in accordance with the provider reimbursement manual, as promulgated by the director for the Idaho medicaid program, and the health insurance manual 15, as

promulgated by the United States department of health and human services or its predecessor agency; provided, that the provider reimbursement manual shall take precedence over the health insurance manual 15 in case of conflict, ambiguity or disagreement.

I.C. § 56–110(a).

The introductory section of the PRM states:

Fiscal administration of the Idaho Title XIX Medicaid Program will be in accordance with the applicable Federal (42 CFR part 447—SSA HIM 15 Providers Reimbursement Manual and MSA PRG 19) and state rules, as amended. The provisions shall apply unless otherwise authorized. This chapter is an outline of the general rules and applications thereof. Questions regarding specifics and exceptions should be directed to the Department.

16 IDAPA 3.10000.01(a).

Concerning related-party transactions, the PRM provides that costs for services furnished to a provider by a related party are allowable at the amount the services cost the related party. 16 IDAPA 3.10150.01. Concerning regulation of cost allowability, the PRM states: "Allowability of costs is subject to the regulations prescribing the treatment of specific items as outlined in ... the Providers Reimbursement Manual, SSA–HIM Chapter 10 . . . ." 16 IDAPA 3.10150.02.

Under the PRM, an entity is related to the provider if, "[t]he provider, to a significant extent, is associated or affiliated with, or has control of, or is controlled by, the organization furnishing the services, facilities, or supplies." 16 IDAPA 3.10151.05.

It is undisputed that at the time the contract was signed, CCC and ASC (which merged with and became HSG) were related by common ownership and the contract was a related-party transaction. By at least 1991, CCC and HSG were no longer related. The PRM's regulations concerning related-party transactions speak in the present tense and do not address the effect of a subsequent change in the related-party status of the parties where they have signed a long-term contract. The HIM 15 does address this exact situation. Section 1011.2 of the HIM 15, under the subsection entitled "SPECIAL APPLICATIONS," provides:

Termination of Relationship. If a provider and a supplier are related by common ownership or control at the time of executing a supply contract, the provider's allowable costs will be governed by the related ownership principle through the full term of the supply contract, even if the common ownership or control terminates before the end of the contract.

Because CCC and ASC were related at the time the contract was executed, the related-party rules govern the relationship for the full term of the contract pursuant to HIM 15, section 1011.2. HIM 15, section 1011.2 is not in conflict with the PRM. It merely controls a special set of circumstances that are not covered by the PRM.

CCC contends that it is entitled to reimbursement based on the contract rate pursuant to an exception to the related-party rules. The PRM allows the following exception to the related-party rules:

An exception is provided to the general rule applicable to related organizations. The exception applies if the provider demonstrates by convincing evidence to the satisfaction of the [department]:

    01.  Supplying Organization. That the supplying organization is a bona fide separate organization;

    02.  Nonexclusive Relationship. That a substantial part of the supplying organization's business activity of the type carried on with the provider is transacted with other organizations not related to the provider and the supplier by common ownership or control and there is an open, competitive market.

16 IDAPA 3.10153.

A similar exception is contained in the section 1010 of the HIM 15. However, the exception in the HIM 15 contains some additional requirements. To the extent that the exception in the HIM 15 contains additional requirements, it is inconsistent with the PRM and the PRM controls pursuant to I.C. § 56–110(a).

The hearing officer ruled that, in order to qualify for the exception in the PRM, CCC must have qualified for the exception at the time the contract was executed. We agree. It would be contrary to the obvious intent of the related-party restriction to look at market conditions as they exist years after the contract was signed and the price determined.

The hearing officer found that CCC failed to establish that a substantial part of ASC's business activity was transacted with other organizations not related to the provider based on the evidence that all of ASC's business activity for the less than the thirty-day period that it was in existence and owned by Southmark was carried on with related organizations. This finding must be upheld if supported by substantial evidence in the record. I.C. § 67–5279(3). There is substantial evidence to support this finding.

## III.

### THE REGULATIONS ARE NOT UNCONSTITUTIONALLY VAGUE.

■ CCC asserts that the department's regulatory scheme for Medicaid reimbursements is unconstitutionally vague. We disagree.

■ "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning, and differ as to its application, violates the first essential of due process of law." *State v. Marek*, 112 Idaho 860, 866, 736 P.2d 1314, 1320 (1987). "However, greater tolerance is permitted when addressing a civil or non-criminal statute as opposed to a criminal statute under the void for vagueness doctrine." *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 716, 791 P.2d 1285, 1295 (1990). "A civil or non-criminal statute in not unconstitutionally vague if persons of reasonable intelligence can derive core meaning from it." *Id.*

In the present case, I.C. § 56–110(a) states that reimbursement is to be in accordance with both the PRM and the HIM 15. The introductory section of the PRM states that administration of the program will be in accordance with the PRM and the HIM 15. 16 IDAPA 3.10000.01(a). In the portion of the PRM regarding related-party transactions, the PRM states that chapter 10 of the HIM 15 is applicable. 16 IDAPA 3.10150.02. In addition, CCC's initial cost report acknowledged that CCC had engaged in a related-party transaction with respect to laundry and housekeeping services under the HSG Contract in 1991. The department's regulatory scheme is not unconstitutionally vague. The regulations are sufficiently clear to inform a person of reasonable intelligence that the HIM 15 is incorporated with regard to related-party transactions to the extent the HIM 15 is not inconsistent with the PRM.

## IV.

### CONCLUSION

We affirm the department's denial of reimbursement to CCC based on the contract rate.

We award costs on appeal to the department.

TROUT, C.J., and McDEVITT, SILAK and SCHROEDER, JJ., concur.